This matter is before me on petition of the New Brunswick Trust Company and order to show cause issued thereon. The petition alleges that the New Brunswick Trust Company prior to June 22d 1933 (on which day it suspended its ordinary banking business) had issued three series of bonds, each series in the aggregate sum of $250,000, and known respectively as "Series A," "B" and "C." The payment of the bonds was secured by collateral deposited with the Elizabeth Trust Company as trustee under three certain deeds of trust. The collateral consisted of real estate bonds and mortgages in amount equal to the bond issue. The New Brunswick Trust Company at the time of suspension of its business had in its possession bonds in each of the three series, some of which bonds remained in its possession unsold and some of which it reacquired in the ordinary course of business.
A plan of reorganization pursuant to chapter 116, P.L. 1933, as amended chapter 287, Pamph. L. 1933, was submitted and accepted by more than two-thirds of the stockholders and by more than seventy-five per cent. in amount of the depositors and other creditors of the New Brunswick Trust Company and approved by the commissioner of banking and insurance, following which the bank reopened and carried on its usual banking business.
The plan of reorganization provided for the issuance of preferred stock to the depositors for a percentage of their claims, and further provided that the bank be "relieved of its liability on account of the bonds outstanding. The consideration to be offered the bondholders for waiving their rights to the guarantee is mentioned in a later paragraph." That *Page 546 
which was meant by the words "rights to the guarantee" can only be the claims of the bondholders against the company for such part of the amount due on the bonds as was not satisfied out of the collateral. There was no "guarantee" by the company; the bonds were its own direct obligations. The "later paragraph" referred to was the sixth paragraph which reads:
"Have the Common Stock changed from 3,000 shares at $100.00 par value each to 30,000 shares at $10.00 par value each and distribute this Stock to the three groups of creditors as follows:
 To the unsecured Depositors .............................. 51%
 To the Mortgage Bond and Participation Certificate Holders 16%
 To the present Common Stockholders ....................... 33%"

The bondholders, who consented to the plan of reorganization, executed an agreement in and by which they agreed to accept that which was to be realized from a liquidation of the collateral, together with the provision contained in the plan for their benefit, "in full satisfaction and discharge of all that is due or to grow due" and released the New Brunswick Trust Company from any liability on the said bonds.
Thereafter the bondholders selected Russell B. Howell, Joseph H. Lee and George D. Ziegler as trustees in the place and stead of Elizabeth Trust Company. A trust agreement setting forth the duties of the new trustees was executed by all holders of bonds in "Series A" and "Series C" and by ninety per cent. in amount of the holders of bonds in "Series B." The remaining holders of bonds in "Series B" refused to sign the trust agreement and in consequence thereof the trustees petitioned this court to take jurisdiction of the trust assets in their hands as trustees under "Series B," and thereupon this court appointed the said Howell, Lee and Ziegler, trustees.
Substantial sums of money collected by the trustees on account of the collateral in the various series and now held in escrow on account of principal claimed to be due to the New Brunswick Trust Company are: in "Series A" $6,900, in "Series B" $3,000 and "Series C" $12,300. In addition to the principal so collected and held in escrow the trustees *Page 547 
also hold interest collected in "Series A" $1,104, in "Series B" $825 and in "Series C" $1,640.
The petition alleges that prior to December 24th, 1933, the plan of reorganization herein mentioned was submitted, and that on that date it had in its possession and owned five and one-half per cent. mortgage bonds in the amount of $83,600, which bonds represented those which had been issued but never sold by the New Brunswick Trust Company and also bonds which had been sold from time to time by the New Brunswick Trust Company and reacquired by it in the ordinary course of business, the number and amount of such bonds is not in proof before me. The bonds owned by the New Brunswick Trust Company are divided between the three series as follows: "Series A" $27,600, "Series B" $15,000, "Series C" $41,000.
The petitioner, the New Brunswick Trust Company, now brings this petition praying that the trustees be directed to turn over to it the moneys held by the trustees in escrow as hereinabove set forth.
The bondholders and the trustees deny the right of the New Brunswick Trust Company to share in the fund arising from the liquidation of the collateral. It is their contention that the New Brunswick Trust Company is only entitled to share in the surplus, if any, remaining after all the other bondholders are paid in full, since the bonds held by it are the direct obligation of the Trust Company. The bondholders who did not consent to the plan of reorganization contend that they are not bound thereby because the plan of reorganization was not adopted in accordance with the provisions of chapter 116, P.L. 1933, as amended chapter 287, P.L. 1933, and upon the further ground that the statute violates article IV, section VII, paragraph III of the State Constitution; article I, section X, paragraph I of the United States Constitution; and that it deprives them of their property without due process of law in violation of thefourteenth amendment to the Constitution of the United States, and is therefore unconstitutional.
The cited statute as amended provides by section 7 that: "Any such bank, trust company or savings bank which has *Page 548 
not been permitted or licensed by the Commissioner of Banking and Insurance, or by the Secretary of the Treasury, if said bank or trust company is a member bank of the Federal Reserve System, to perform all of its usual banking functions, may be reorganized for the resumption of its normal and usual banking business by the issuance of preferred stock as hereinabove provided, orotherwise. Any reorganization plan may provide for the issuance of preferred stock to all of the depositors and other creditors of such bank or trust company or savings bank, and may provide that each creditor and depositor must subscribe at least a certain percentage of his claim for said stock. Any
reorganization plan shall become effective (1) when the Commissioner of Banking and Insurance shall be satisfied that the plan of reorganization is fair and equitable as to all depositors, other creditors and stockholders and is in the public interest and shall have approved the plan subject to such conditions, restrictions and limitations as he may prescribe, and (2) when, after such notice of such reorganization as the Commissioner of Banking and Insurance may require, (a) depositors and other creditors of such bank, trust company or savings bank representing at least seventy-five per centum (75%) of its total deposits and other liabilities as shown by the books thereof, and (b) stockholders owning at least two-thirds of its outstanding capital stock as shown by the books thereof, shall have consented in writing to the plan of reorganization; provided, however, that claims of depositors or other creditors which under existing law are entitled to full and immediate payment, even though said bank, trust company or savings bank is operating on a restricted basis, shall not be included among the total deposits and other liabilities of said bank, trust company or savings bank in determining the seventy-five per centum (75%) thereof as above provided." (Italics mine.)
It is argued that because the plan did not provide for the issuance of preferred stock to the bondholders instead of common stock, that the plan is not within the authority granted by the act. The primary object of the act is to enable closed banking institutions to reorganize and resume their normal business. The reorganization as prescribed by *Page 549 
the act is to be accomplished by the issuance of preferred stockor otherwise. While the act provides that any reorganization plan may provide for the issuance of preferred stock to all of the depositors and other creditors yet the use of the words orotherwise indicates a legislative intent that any other method pursued and approved as provided by the act is sufficient. The principal concern of the legislature was, it seems to me, that the plan adopted be fair and equitable as to all, and be in the public interest. Before any plan becomes effective under the act the Commissioner of Banking and Insurance is charged with the duty of determining whether "the plan * * * is fair and equitable" to all interested parties and having so determined shall approve it, and the depositors and creditors representing seventy-five per centum of the bank's total deposits and other liabilities and stockholders owning at least two-thirds of the capital stock must consent in writing to the plan. The plan adopted was approved by the Commissioner of Banking and Insurance and consented to by seventy-five per centum of the total depositors and creditors; and by stockholders owning two-thirds of the capital stock. I am of the opinion that the plan of reorganization in the instant case is in compliance with the statute.
The constitutionality of this act was considered in the case ofIn re Mechanics Trust Co., 119 N.J. Eq. 141, 181 Atl. Rep. 423.
The constitutional grounds upon which the act was attacked in that case are identical with those advanced in the instant case. We held upon the authority of the decisions of the United States supreme court and the courts of our sister states cited in the opinion that the act in question was constitutional.
Petitioner contends that inasmuch as it has been under the plan of reorganization relieved of its liability to the bondholders it is entitled to share pro rata in the collateral to the extent of the bonds which it holds. It relies upon the case of Kelly
v. Middlesex Title, c., Trust Co., 115 N.J. Eq. 592;171 Atl. Rep. 823; affirmed, 116 N.J. Eq. 574; 174 Atl. Rep. 706.
The release referred to signed by the individual bondholders recites that in order to put into effect the plan of *Page 550 
reorganization adopted by the directors of the bank and approved by the commissioner, the bondholders, certificate holders and stockholders, reads in part as follows: "And I do hereby agree to accept that which may be realized from the administration and/or liquidation of the mortgages pledged with Elizabeth Trust Company as security for said bonds, together with provisions for my benefit in said plan, in full satisfaction and discharge of all that is due or to grow due to me by reason of my said bonds and I do hereby release and discharge the said New Brunswick Trust Company of and from all claims and demands accruing to me by reason of said bonds, and the coupons attached thereto." (Italics mine.) It appears therefore that the bondholders looked to the bonds and mortgages deposited as collateral to satisfy their bonds and intended to release the Trust Company only to the extent that the collateral was insufficient to discharge their claims in full.
In Kelly v. Middlesex Title, c., Trust Co., supra, the title company sold and assigned part interest in mortgages which it owned, accompanied by its own guarantee of payment. These were known as "participation certificates." Later when the company became insolvent and its assets were taken over for liquidation by the Commissioner of Banking and insurance, the question arose as to whether the interests of the participation certificate holders were prior and paramount to the interest retained by the company. It was there held that each assignee held an equitable ownership in a pro rata fractional share of the bond and mortgage, without priority over the interest of any other assignee nor over the share remaining unassigned.
That case is markedly distinguishable from the instant case in that there the company's obligation on its guarantee wassecondary while here the petitioner's obligation is primary.
This distinction is noted by Vice-Chancellor Buchanan in Kelly
v. Middlesex, c., Trust Co., 116 N.J. Eq. 228, 237;172 Atl. Rep. 487, as follows: "The situation in the instant case is entirely different from that in the case of a company which has issued its own bonds or obligations against a trust fund composed of numerous bonds and mortgages *Page 551 
assigned to a trustee as security for the payment of the company's bonds or obligations. In the instant case, the company did not issue its own primary obligations, and did not set up any such trust fund. It assigned to its customers the whole of, or a part interest in, a particular bond and mortgage, and gave its secondary obligation or guarantee of payment, accompanying such assignment."
The situation existing in the instant case is simply that of a debtor pledging bonds and mortgages as collateral security for an indebtedness. That a bond and mortgage may be pledged as collateral security for an indebtedness is well settled. Sulken
v. United Holding Co., 14 N.J. Mis. R. 275; 184 Atl. Rep. 405;Shaw v. Hughan, 109 N.J. Eq. 317; 157 Atl. Rep. 126; Mott v.Newark German Hospital, 55 N.J. Eq. 722; 37 Atl. Rep. 757;Kamena v. Huelbig, 23 N.J. Eq. 78. If default is made, the pledgee may proceed to collect the pledge. Sulken v. UnitedHolding Co., supra; Polhemus v. Prudential Realty Corp.,74 N.J. Law 570; 67 Atl. Rep. 303. If there be any surplus it belongs to the pledgor. Shaw v. Hughan, supra.
The collateral was the property of the petitioner who was the obligor or debtor on the serial bonds; and was assigned by it to the bondholders (i.e., to the trustee for the benefit of the bondholders) as security for the payment of those serial bonds. Any surplus over that which is required for the payment of those bonds of course belongs to petitioner. But the petitioner-debtor on those bonds can have no other interest than that of pledgor in such collateral; it is not a creditor (bondholder) for whose benefit the collateral was pledged. It cannot be a creditor of itself. Those bonds which were authorized but never issued never became obligations for which the collateral was pledged; and as to those bonds which were issued but subsequently reacquired by petitioner they ceased to be obligations upon such reacquirement. They have in effect been paid.
The petitioner is not entitled to share pro rata in the liquidation of the collateral. It is only entitled to receive the surplus after the other bondholders are paid in full. *Page 552